# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

**Civil Case No. 16-314 (SRN)**

John R. Stoebner, Trustee,

           Appellant,

    v.

Opportunity Finance, LLC;
Opportunity Finance Securitization,
LLC; Opportunity Finance
Securitization II, LLC; Sabes Minnesota
Limited Partnership; Robert W. Sabes;
Janet F. Sabes; Jon R. Sabes;
Steven Sabes; DZ Bank AG Deutsche
Zentral-Genossenschaftsbank,
Frankfurt Am Main; and
John and Jane Does 1-30,

           Appellees.

**MEMORANDUM
OPINION & ORDER**

---

Richard T. Thomson, John R. Stoebner, Amy L. Schwartz, and Rosanne H. Wirth, Lapp, Libra, Thomson, Stoebner & Pusch, Chartered, 120 South Sixth Street, Suite 2500, Minneapolis, MN 55402, for Appellants

Joseph G. Petrosinelli, Jonathan M. Landy, and Christopher Mandernack, Williams & Connolly, LLP, 725 Twelfth Street, Northwest, Washington, D.C. 20005; John R. McDonald, Kari S. Berman, and Scott M. Flaherty, Briggs & Morgan, PA, 80 South Eighth Street, Suite 2200, Minneapolis, MN 55402, for Opportunity Finance Appellees

Michael A. Rosow, Winthrop & Weinstine, PA, 225 South Sixth Street, Suite 3500, Minneapolis, MN 55402; H. Peter Haveles, Jr., Kaye Scholer LLP, 250 West 55th Street, New York, NY 10019, for Appellee DZ Bank AG Deutsche Zentral-Genossenschaftsbank

---

SUSAN RICHARD NELSON, United States District Judge

Appellant/Plaintiff John R. Stoebner,[1] Trustee in bankruptcy for Polaroid Corporation and other related debtors ("the Polaroid Debtors") appeals from a January 14, 2016 order ("the Order") of the United States Bankruptcy Court for the District of Minnesota ("Bankruptcy Court") and an oral order made by that same court on December 1, 2015. For the reasons set forth herein, the Trustee's appeal is denied.

## I.    BACKGROUND

This matter arises from an underlying adversary proceeding in Bankruptcy Court. The Trustee filed suit under the Minnesota Uniform Fraudulent Transfer Act, ("MUFTA"), to avoid certain prepetition payments to the following lenders:  Defendants Opportunity Finance, LLC and related Opportunity Finance entities (collectively, "Opportunity Finance"), DZ Bank AG Deutsche Zentral-Genossenschaftsbank ("DZ Bank"), Sabes Minnesota Limited Partnership, Robert W. Sabes, Janet F. Sabes, Jon R. Sabes, Steven Sabes, (collectively, "the Sabes Family"), and John and Jane Does 1-30. Under the MUFTA, creditors may recover assets that debtors have otherwise fraudulently transferred to third parties. Finn v. Alliance Bank, 860 N.W.2d 638, 644 (Minn. 2015).

Defendants Opportunity Finance and DZ Bank moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), as incorporated by Fed. R. Bankr. P. 7012(b). While Defendants' motion was pending, at a December 1, 2015 omnibus hearing, the Trustee requested leave to file a third amended complaint. (See 12/1/15 Bankr. Tr., Tab 2 to Opp. Fin. Appendix [Doc. No. 22 at 29-31].) From the bench, Chief Bankruptcy Court Judge Gregory F.

---

[1]  The Court refers to the parties as Plaintiff/Trustee and Defendants, rather than Appellant and Appellees.

2

Kishel declined to entertain the Trustee's request until after the issuance of his ruling on the pending dispositive motions.  (Id. at 47-58.)  Six weeks later, in the written Order on Defendants' motions, Chief Judge Kishel granted Defendants' motion and dismissed the case with prejudice, finding that any amended pleadings would contradict the facts already alleged so as to be futile.  In re Polaroid, 543 B.R. 888, 903, 905, 915 (Bankr. D. Minn. 2016).[2]  The Trustee filed the instant appeal [Doc. No. 1] of the Order and the bench ruling.

### A.    Petters Consumer Brands, LLC

Before the collapse of Tom Petters' Ponzi scheme in September 2008, (see Second Am. Compl. ("SAC") ¶ 20 [Doc. No. 18]), Petters utilized a variety of corporate entities, most notably Petters Company, Inc. ("PCI") and Petters Group Worldwide, LLC ("PGW"), to operate a massive Ponzi scheme.  In re Polaroid, 543 B.R. at 890.  Petters was ultimately convicted on multiple counts of fraud, (SAC ¶ 21), and this Court appointed a receiver to marshal and secure his assets.  See In re Polaroid, 543 B.R. at 890. The receiver placed PCI and many of Petters' affiliated entities into Chapter 11 bankruptcy.  Id.  Clawback proceedings were initiated by bankruptcy trustees involving the PCI entities in order to recover some of the losses sustained by Petters' later lender-investors.  Id.  The Polaroid Corporation, which Petters ultimately acquired in 2005, was also placed into Chapter 11 bankruptcy.  (SAC ¶ 2.)  The Polaroid Debtors converted the Polaroid cases to proceedings administered under Chapter 7 of the Bankruptcy Code.

---

[2]  Citations are to the published opinion of the Order.

(SAC ¶ 3.)  The Trustee here, John R. Stoebner, was appointed to represent the interests of creditors of the Polaroid debtors.  (SAC ¶ 3.)  While Petters later acquired the Polaroid Corporation, the facts at issue here occurred before then, when Polaroid was Petters' contractual counterparty, outside of the Petters enterprises.  In re Polaroid, 543 B.R. at 891.

The Petters entity directly at issue here is Petters Consumer Brands, LLC ("PettersCB").  During the relevant time period of 2003-2005, PettersCB, under a contractual license agreement with Polaroid, used the Polaroid brand name on certain goods, which PettersCB then sold to retailers like Best Buy.  (SAC ¶¶ 24; 36; 40.)  But as the Trustee acknowledges, "[U]nlike many of Tom Petters' companies, [PettersCB] actually purchased, warehoused, and sold to prominent retailers high volumes of consumer electronic equipment, branded with the Polaroid name."  (SAC ¶ 24.)  As alleged in the SAC, Opportunity Finance provided funding to PettersCB which it then used to purchase consumer electronics for resale to retailers or to pay third parties regarding the electronics.  (SAC ¶¶ 40-41.)  DZ Bank was a senior secured lender to Opportunity Finance, providing Opportunity Finance with funding for its lending to PettersCB.  (SAC ¶ 14.)  The Trustee generally alleges that Tom Petters used PettersCB to further his Ponzi scheme, (SAC ¶¶ 19; 24), and that Opportunity Finance was a significant investor and "net winner" in Petters' scheme, receiving "false profits" from "Tom Petters' entities" and "far higher annual rates of return on its investments with Tom Petters' entities than were commercially reasonable."  (SAC ¶¶ 27-28.)  In addition, the Trustee alleges that PettersCB was used to launder money from the overall Ponzi scheme

and "prop up" its losses; Tom Petters is further alleged to have personally taken Ponzi proceeds out of PettersCB.  (SAC ¶¶ 25-26.)

The Trustee asserts that, eventually, Opportunity Finance insisted that PettersCB create an entity called Petters Consumer Brands Funding, LLC ("PettersCB Funding") as a "bankruptcy remote vehicle."  (SAC ¶¶ 46-47.)  Established on or about July 28, 2003, PettersCB Funding was allegedly intended to "shield[ ] Defendants from the consequences of [PettersCB's] inevitable bankruptcy."  (Id. at ¶ 46.)  The Trustee alleges that the envisioned "plan" was for PettersCB Funding to be a "real" and independent entity to which Opportunity Finance would provide loans.  (Id.)  In exchange, PettersCB Funding would use the loan proceeds to purchase accounts receivable from PettersCB. (Id.)  PettersCB would use the money obtained from PettersCB Funding to buy more consumer goods to resell.  (Id.)  However, the Trustee asserts that the sales of accounts received between PettersCB and PettersCB funding "were not true sales."  (SAC ¶ 48.) Moreover, he contends that when Opportunity Finance "swept the [PettersCB Funding] bank account to pay itself the principal and interest due on its loans," Opportunity Finance returned the excess profit to PettersCB, not PettersCB Funding.  (Id.)  Thus, the Trustee alleges that in actuality, PettersCB Funding lacked the true attributes of a bankruptcy-remote entity, (SAC ¶ 50), and was a "mere conduit" for transferring money. (SAC ¶ 51.)

The Trustee also alleges that in April 2005, PettersCB paid Opportunity Finance $349,000 as a prepayment penalty (the "Prepayment Penalty Transfer").  (SAC ¶ 52.) However, the Trustee asserts that no such penalty was owed, since the notes on which the

Prepayment Penalty Transfer was made provided for prepayment without penalty.  (SAC ¶¶ 53-54.)

Based on the financing agreement between PettersCB and Opportunity Finance and the agreement between Opportunity Finance and DZ Bank, the Trustee alleges that the transfers to Opportunity Finance, purportedly in repayment of the loans, were fraudulent transfers under the MUFTA.  (SAC ¶¶ 27; 31.)  The Trustee also alleges that DZ Bank provided funding to Opportunity Finance, which was presumably loaned to PettersCB.  (SAC ¶ 14.)  One of the Trustee's asserted bases of liability for actual fraud under the MUFTA involves the application of the "Ponzi scheme presumption," although the Trustee does not use this specific term in the SAC.[3]  (See SAC ¶¶ 19-35.)  In addition, the Trustee asserted state law claims for breach of contract, relating to the Prepayment Penalty Transfer made to Opportunity Finance, (SAC ¶¶ 110-13), and a count in the alternative for fraud and misrepresentation as to the Prepayment Penalty Transfer.  (SAC ¶¶ 114-23.)

### B.    Procedural History

The Trustee commenced the underlying action against Defendants on December 17, 2010.  (Bankr. D. Minn. No.  ADV-10-4600, ECF No. 1.)  Pursuant to the parties' stipulation, the Bankruptcy Court approved the filing of an amended complaint.  (Id., ECF Nos. 19-20.)  On May 3, 2011, the Trustee filed the First Amended Complaint.  (Id.,

---

[3]  The Ponzi scheme presumption, recognized by several federal courts, presumes that transfers made in furtherance of a Ponzi scheme were made with the actual intent to defraud.  Ritchie Capital Mgmt., LLC v. Stoebner, 779 F.3d 857, 862 (8th Cir. 2015) (collecting cases).

ECF No. 21.)  He filed the SAC on November 8, 2013.  (Id., ECF No. 46.)

On December 20, 2013, Opportunity Finance and DZ Bank filed the underlying motions to dismiss the SAC.  (Id., ECF Nos. 48; 49.)  The Bankruptcy Court heard oral argument on March 3, 2014.  (Id., ECF No. 57.)  However, prior to the issuance of a ruling, the Minnesota Supreme Court, in an entirely separate legal action, ruled on February 18, 2015, that the Ponzi scheme presumption could not be applied to establish actual fraud under the MUFTA.  Finn, 860 N.W.2d at 653.

On December 1, 2015, the Bankruptcy Court held an omnibus hearing to discuss various issues in related bankruptcy cases.  (See 12/1/15 Bankr. Tr., Tab 2 to Opp. Fin. Appendix [Doc. No. 22 at 47-58].)  At the omnibus hearing, counsel for the Trustee expressed his intent to seek to amend the SAC for seven reasons: (1) to address any issues raised by defendants regarding Finn in the separate PCI litigation; (2) to allege with greater specificity the issue of initial versus subsequent transferee; (3) to allege standing with greater specificity; (4) to correct allegations identifying predicate creditors; (5) to set forth the Trustee's claims with greater clarity; (6) to allege a claim for unjust enrichment; and (7) to eliminate some legal theories.  (Id. at 29-31.)  Defendants objected, arguing that the Trustee should have raised any deficiencies and proposed amendments when he responded to their motions to dismiss in early 2014.  (Id. at 33.)  Moreover, Defendants noted that the Minnesota Court of Appeals' November 2013 decision in Finn, while slightly different than the Minnesota Supreme Court's ultimate decision, raised issues implicating these pleadings even before the deadline for the Trustee's response to Defendants' motion to dismiss.  (Id. at 35.)  Defendants also argued that to permit the

7

Trustee to amend, two years after Defendants had filed their motions to dismiss, would be unfairly prejudicial.  (Id. at 33.)  Citing Rule 16, Chief Judge Kishel denied the Trustee permission to seek leave to amend the complaint until after he had issued his pending ruling on Defendants' motions to dismiss.  (Id. at 40-41.)

### C.      The Bankruptcy Court's Order

Six weeks later, in the Order, Chief Judge Kishel granted Defendants' motions to dismiss on two bases.  First, he found that the Trustee lacked statutorily-based standing to seek avoidance of transfers made by PettersCB.  In re Polaroid, 543 B.R. at 897-903. Because PettersCB was not in bankruptcy, and the Plaintiff was appointed the Trustee of the Polaroid Corporation and Polaroid-entities, the bankruptcy judge held that the Trustee had no authority to sue.  Id. at 898-903.  Moreover, the Bankruptcy Court concluded that the creditors identified in the SAC lacked standing as well, because the Trustee's factual allegations failed to support a legally-enforceable right to payment from the debtor.  Id. Accordingly, the Bankruptcy Court found that these failings warranted dismissal of the Trustee's fraudulent transfer claims under Rule 12(b)(6).  Id. at 903.

In addition, Chief Judge Kishel found that the Trustee's claims further failed to satisfy the elements of actual or constructive fraudulent transfer under the MUFTA.  Id. at 908-09.  In light of the Minnesota Supreme Court's decision in Finn, the Bankruptcy Court held that the Trustee's fraudulent transfer claims based on the Ponzi scheme presumption failed as a matter of law.  Id. at 906-09.

And, even aside from the unavailing Ponzi scheme presumption, Chief Judge Kishel also found that in light of Finn, the Trustee's pleading of actual and constructive

fraud was deficient.  Id.  As to whether the debtor received reasonably equivalent value in exchange for the transfers[4], Chief Judge Kishel observed that the SAC insinuated that "PettersCB could not have received reasonably equivalent value from repaying a lender on any loan to it, legitimately contracted and used or not."  Id. at 908.  But this broad pleading, the Bankruptcy Court determined, ran afoul of Finn's requirement of pleading the elements of fraudulent transfer, asset-by-asset and transfer-by-transfer.  Id.  Instead, Chief Judge Kishel found that throughout the SAC, "the Trustee seeks to avoid payments of money generated from actual sales of concrete goods, consummated consistently with the original contractual expectations for [Opportunity Finance's] lending to PettersCB." Id. at 909.  While Chief Judge Kishel envisioned several ways in which a pleading could tie PettersCB to the main Ponzi scheme, he noted that the SAC did not plead such facts. Id. at 910.

While the Trustee alleged that the Opportunity Finance loans' interest rate was excessively high at 12%, (SAC ¶¶ 63-64), and thus demonstrated the lack of reasonably equivalent value, and constituted "false profits,"  (id. ¶ 65), the Bankruptcy Court found such pleading conclusory and devoid of any context.  In re Polaroid, 543 B.R. at 908.  In addition, Chief Judge Kishel rejected the notion that such an interest rate would yield false profits under the facts alleging the return of an investment for the financing of actual deals.  Id.

---

[4] As discussed in more detail herein, an exchange for reasonably equivalent value may serve as a defense to a claim of actual fraudulent transfer, while an exchange that is not for reasonably equivalent value is an element of a claim for constructive fraudulent transfer.  See Minn. Stat. § 513.44.

As to the Trustee's allegations of constructive fraud, the Bankruptcy Court analogized them to <u>Finn</u>, in which the debtor-transferor's transfers that were real and legitimate were not found to be constructively fraudulent, despite the fact that the debtor-transferor was running a Ponzi scheme to defraud other investors through the same type of transactions.[5] <u>Id.</u> at 913. Here, the Bankruptcy Court found that the Trustee's allegations suggested that "funds traceable to and from [Opportunity Finance] and through the real-goods transactions were commingled with some funds funneled out of the PCI-centered scheme, toward some undisclosed use by PettersCB." <u>Id.</u> at 914. But, citing <u>Finn</u>, he found that commingling alone does not constitute a lack of reasonably equivalent value. <u>Id.</u>

Regarding the Trustee's claims against Defendant DZ Bank, the alleged subsequent transferee from Opportunity Finance, the Bankruptcy Court held that because the claims against the initial transferee failed, the claims against DZ Bank likewise failed. <u>Id.</u> at 915.

In conclusion, Chief Judge Kishel found that the Trustee could not replead an alternate set of facts to counter the effect of <u>Finn</u> without contradicting the facts asserted in the SAC–all of which repeatedly stated that real goods, real sales, and real loans

---

[5] In <u>Finn</u>, the Minnesota Supreme Court held that one of the transferees, Alliance Bank, could establish that it gave reasonably equivalent value in the form of payments made pursuant to a contractual agreement with the transferor-debtor. 860 N.W.2d at 655-56. Moreover, Alliance Bank submitted evidence at the summary judgment stage showing the commercial reasonableness of the rate of return on the loan it had purchased. <u>Id.</u> Under such circumstances, the Minnesota Supreme Court held that the transferor had received reasonably equivalent value. <u>Id.</u> at 656.

supported the transactions between PettersCB and Opportunity Finance.  Id.

Accordingly, the Bankruptcy Court found that it would be futile to amend the pleading,

given that any additional facts that might support the Trustee's claims would contradict

the facts previously alleged.  Id. at 914.  Therefore, Chief Judge Kishel dismissed the

Trustee's MUFTA claims with prejudice.[6]

### D.    Appeal

On appeal, the Trustee argues that the Bankruptcy Court erred in citing Rule 16 in

denying leave to amend.  (Pl.'s Mem. at 2; 24-25.)  He argues that denying the right to

bring a motion for leave to amend effectively denied the motion, improperly, as there was

no evidence that Defendants would be unfairly prejudiced by granting leave to amend.

(Id. at 2; 25-27.)

Regarding standing, the Trustee argues that the bankrupt companies include PHC,

the company into which PettersCB was merged, as well as a subsequent spin off, now

known at PCE.  (Id. at 3; 27-29.)  Further, the Trustee contends that the creditors of the

successor entities have standing to avoid the fraudulent transfers made by their

predecessor.  (Id. at 28.)  Specifically, the Trustee asserts that the creditors of PettersCB

that continued to do business with PCE are among the ranks of PCE's creditors who have

unsecured claims in PCE's bankruptcy.[7]  (Id.)  The Trustee further argues that PCE

---

[6] Because the Trustee does not appeal the Bankruptcy Court's dismissal of his
claims for breach of contract and common law fraud, (Pl.'s Mem. at 22 [Doc. No. 17]),
those claims are not addressed.

[7] As to the identification of creditors, the Trustee concedes that it almost entirely
misidentified the creditors of PettersCB in the SAC, with the exception of Wanlida Group

satisfies the various legal tests to be considered a successor entity.  (Id. at 32-36.)  In addition, or alternatively, the Trustee contends that creditors of PHC had standing to sue under the MUFTA because, by amendment, the Trustee can name predicate creditors for both PCE and PHC.  (Id. at 36-37.)

As to the other aspects of the Trustee's MUFTA claims, he contends that the SAC sufficiently alleges fraudulent transfers of the property of PettersCB.  (Id. at 37-38.)  As to actual fraud, the Trustee contends that "the SAC alleges both that (a) PettersCB knew that by making transfers to Defendants, PettersCB would induce future creditors to make investments in PettersCB; and (b) PettersCB knew that those creditors would be left unpaid when the inevitable exposure of Petters' Ponzi scheme caused PettersCB to fail." (Id. at 39.)  The Trustee argues that the SAC sufficiently alleges the inevitability that PettersCB would fail when the Ponzi scheme was exposed and that "without financing, an insolvent and unprofitable company cannot survive."  (Id. at 40.)  Likewise, the Trustee asserts that Chief Judge Kishel apparently overlooked the allegation in paragraph 39 of the SAC that PettersCB actually knew it was inducing creditors to invest despite the certainty that PettersCB would fail.  (Id. at 41.)  In addition, the Trustee argues that a lack of reasonably equivalent value is alleged, citing the 12% interest rate and the $349,000 Prepayment Penalty Transfer.  (Id. at 45-47.)

---

Co., Ltd., ("Wanlida"), a creditor of PCE.  (Pl.'s Mem. at 43.)  The Trustee seeks leave to amend its complaint to add seven other creditors who are creditors of PCE and PHC. (Id.)

As to the constructive fraud claim, the Trustee again argues that the SAC sufficiently alleges a lack of reasonably equivalent value.  (Id. at 43.)  For all of the transfers except the Prepayment Penalty Transfer, the Trustee cites his 12% interest rate allegation.  (Id. at 44.)  With respect to that rate, the Trustee argues that he was not required to allege the comparative market rate in his pleading.  (Id. at 45-47.)  He also argues that the Bankruptcy Court failed to address the adequacy of his allegation that PettersCB received "no value at all" in exchange for the Prepayment Penalty Transfer. (Id.)

Finally, the Trustee contends that the Bankruptcy Court erred in holding that Plaintiff could not state a claim against DZ Finance, in light of the failure to plead adequate claims against the initial transferee.  (Id. at 48.)  Again, the Trustee maintains that had he been permitted to amend his pleading, he could have adequately asserted his claims against Opportunity Finance, and by extension, DZ Bank.  (Id.)

## II.   DISCUSSION

In an appeal from a bankruptcy court proceeding, the Court acts as an appellate court.  See 28 U.S.C. § 158(a). The Bankruptcy Court's legal conclusions are reviewed de novo and its findings of fact are reviewed for clear error.  Tri-State Fin., LLC v. First Dakota Nat'l Bank, 538 F.3d 920, 923-24 (8th Cir. 2008); accord Fed. R. Bankr. P. 8013.

The Bankruptcy Court applied the correct legal standard to the underlying motions to dismiss.  In re Polaroid, 543 B.R. at 895.  Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, dismissal is warranted where a plaintiff "fail[s] to state a claim upon which relief can be granted."  In evaluating a motion to dismiss, the court "must take the

well-pleaded allegations of the complaint as true, and construe the complaint, and all reasonable inferences arising therefrom, most favorably to the pleader." Morton v. Becker, 793 F.2d 185, 187 (8th Cir. 1986). Although the complaint need not contain "detailed factual allegations," it must plead facts sufficient "to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). Thus, to survive a motion to dismiss, the plaintiff's "obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions." Benton v. Merrill Lynch & Co., Inc., 524 F.3d 866, 870 (8th Cir. 2008) (quotations and citation omitted). Rather, "the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quotation and citation omitted).

### A.    Procedural Issues

While an appellate court reviews a denial of leave to amend under an abuse of discretion standard, it applies a de novo standard of review to the underlying legal conclusion that an amendment to the complaint would have been futile. Marmo v. Tyson Fresh Meats, Inc., 457 F.3d 748, 755 (8th Cir. 2006).

The Trustee argues that Chief Judge Kishel erred in failing to address its oral motion for leave to amend the complaint before ruling on Defendants' already-pending motions to dismiss. (Pl.'s Mem. at 24) (citing Pure Country, Inc. v. Sigma Chi Fraternity, 312 F.3d 952, 956 (8th Cir. 2002); Bishop v. Minn. Dep't of Human Servs., No. 14-CV-1898 (ADM/SER), 2015 WL 4920262, at *3 (D. Minn. Aug. 12, 2015); Constantine v. Krueger, No. 13-2867 (MJD/LIB), 2014 WL 4449696 (D. Minn. July 31, 2014)). While

it is generally the case that a pending motion for leave to amend should be considered prior to ruling on a motion to dismiss, see Pure Country, 312 F.3d at 956, it is not required in this instance.

Under Rule 15, "there is no automatic right to amend one's complaint." Deutsche Fin. Servs. Corp. v. BCS Ins. Co., 299 F.3d 692, 700 (8th Cir. 2002). Leave to amend may be denied for reasons such as undue delay, bad faith, or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the non-moving party, or futility of amendment. Hammer v. City of Osage Beach, Mo., 318 F.3d 832, 844 (8th Cir. 2003). In Deutsche, the court affirmed the denial of the plaintiff's request to amend a second time where (1) nearly a year had passed since the deadline for seeking leave to amend; (2) extensive discovery had been conducted and the discovery period was closed; and (3) dispositive motions were filed and pending before the court. 299 F.3d at 700. Similarly, in Ikeri v. Sallie Mae, Inc., No. 13-CV-1943 (DSD/JSM), 2014 WL 4071953, at *2 (D. Minn. Aug. 18, 2014), the plaintiffs moved to amend their complaint two months after the defendant had moved to dismiss, and only two days before the hearing on the defendant's motion to dismiss. This Court denied leave to amend, finding that the plaintiff had delayed in bringing the motion to amend and that the defendant had demonstrated prejudice, "as its counsel had fully briefed and prepared for the pending hearing concerning the motion to dismiss before plaintiffs brought their dilatory motion." Id.

Here, a review of the relevant dates is instructive:

| Year | Date | Event |
|------|------|-------|
| 2010 | December 17, 2010 | Adversary proceeding initiated in Bankruptcy Court |
| 2011 | May 3, 2011 | First Amended Complaint |
| 2013 | September 12, 2013 | Finn decision (Minnesota Court of Appeals) |
|  | November 8, 2013 | Second Amended Complaint |
|  | December 20, 2013 | Defendants file Motions to Dismiss |
| 2014 | May 3, 2014 | Oral Argument on Motions to Dismiss |
| 2015 | February 18, 2015 | Finn decision (Minnesota Supreme Court) |
|  | December 1, 2015 | Trustee seeks leave to file a motion to amend at Bankruptcy Court omnibus hearing |
| 2016 | January 14, 2016 | Underlying decision |

As indicated, the Trustee did not seek leave to amend after the motions to dismiss were filed in December 2013, nor at the hearing on the motions to dismiss in March 2014. Nor did the Trustee seek leave to file a motion to amend after the Minnesota Court of Appeals issued its decision in Finn in September 2013.[8]  Nor did the Trustee seek leave in the months immediately after the Minnesota Supreme Court's issuance of Finn in February 2015.  Rather, the Trustee waited nearly two years after the filing of Defendants' motions and over nine months after the Minnesota Supreme Court's issuance

---

[8] As Defendants have observed, while the Minnesota Court of Appeals' decision was not the final word on the viability of the Ponzi scheme presumption to claims arising under the MUFTA, (see 12/1/15 Bankr. Tr., Tab 2 to Opp. Fin. Appendix [Doc. No. 22 at 35]), the court found that applying the presumption to presume lack of reasonably equivalent value was inconsistent with the legislative intent of the MUFTA.  Finn v. Alliance Bank, 838 N.W.2d 585, 601-03 (Minn. Ct. App. 2013).  The Minnesota Supreme Court affirmed this basis of the decision and further rejected application of the presumption on additional bases.  Finn, 860 N.W.2d at 648-52.

of <u>Finn</u> before he sought leave, in December 2015, to file a motion to amend.  The facts

here are therefore quite distinguishable from the authority on which the Trustee relies.  In

those cases, the plaintiffs filed motions to amend or sought leave to amend in their

responses to the defendants' motions to dismiss.  <u>See</u> <u>Pure Country</u>, 312 F.3d at 955;

<u>Bishop</u>, 2015 WL 4920262, at *2; <u>Constantine</u>, 2014 WL 4449696 , at 3.

Plaintiff also argues that the Bankruptcy Court erred in relying on Rule 16 in

denying permission to seek leave to amend.  (Pl.'s Mem. at 24-25.)  The Trustee asserts

that because no scheduling order had yet been issued, the Bankruptcy Court should have

applied Rule 15's more lenient standard to "freely give leave when justice so requires."

(<u>Id.</u> at 25.)

While Chief Judge Kishel specifically invoked Rule 16 instead of Rule 15 when he

denied the Trustee's request, his decision was guided by concerns regarding a significant

Rule 15 factor–the Trustee's delay.  (12/1/15 Bankr. Tr., Tab 2 to Opp. Fin. Appendix

[Doc. No. 22 at 31-32; 40-41].)  Similarly, defense counsel cited the Rule 15 factors of

delay and prejudice.  (<u>Id.</u> at 33-34; 38-40.)  Underscoring the impact of the Trustee's

delay on Defendants and on the Bankruptcy Court, defense counsel stated, "If there were

deficiencies the [T]rustee thought he had in his complaint, he was duty bound to raise

them back at the time that the motion was argued before the court," as opposed to waiting

until the eve of the issuance of the Bankruptcy Court's ruling.  (<u>Id.</u> at 33.)  Directly

invoking Rule 15, DZ Bank's counsel further stated that his client devoted numerous

resources to its motion to dismiss and would be prejudiced if Plaintiff were granted leave

to file a motion to amend.  (<u>Id.</u> at 36.)  Similarly, counsel for Opportunity Finance cited

the lengthy time lag between the Trustee's request for leave and the hearing on the motions to amend as well as the issuance of the <u>Finn</u> decision, stating, "[T]his kind of seriatim or serial amendment that's been taking place . . . really prevents the Court from actually performing its job in terms of adjudicating the motions that are before it."  (<u>Id.</u> 38.)  The Bankruptcy Court's Order likewise identified the repeated failure to cure deficiencies in the three iterations of pleadings.  <u>In re Polaroid</u>, 543 B.R. at 896; 903-04; 914.

While it appears that Rule 15 is the applicable rule here, the Court finds that the Bankruptcy Court's reference to Rule 16 is not grounds for reversal.[9]  Rule 15 factors were, in fact, raised by the parties and considered by the Bankruptcy Court.  The lengthy delay in seeking leave to file a motion to amend was significant.  Defendants were undoubtedly prejudiced in light of the passage of nearly two years from when they had filed their motions to dismiss and over 20 months from the hearing on those motions.  These facts therefore support the Bankruptcy Court's decision to deny leave for the

---

[9]  And, arguably, Rule 16 provides some support for the Bankruptcy Court's decision. The Trustee's request arose in a pretrial conference, conducted pursuant to Rule 16(a)(2), under which courts conduct such conferences to "establish early and continuing control so that the case will not be protracted because of lack of management."  As Opportunity Finance observes, (Opp. Fin. Opp'n at 40 [Doc. No. 21]), the rule also permits courts to consider at pretrial conferences various matters, including "disposing of pending motions," Fed. R. Civ. P. 16(c)(2)(K), and "facilitating in other ways the just, speedy, and inexpensive disposition of the action," Fed. R. Civ. P. 16(c)(2)(P). Considering that Defendants' motions to dismiss had been pending for nearly two years, during which time <u>Finn</u> was issued by the Minnesota Supreme Court, the Bankruptcy Court arguably exercised its management authority in declining to grant leave to file a motion to amend until the issuance of the ruling on the pending motions for dismissal. (12/1/15 Bankr. Tr., Tab 2 to Opp. Fin. Appendix [Doc. No. 22 at 40-41].)

Trustee to file a motion to amend his pleadings a fourth time until after the issuance of the Bankruptcy Court's decision on the pending motions to dismiss.

## B.      Futility

Denying leave to amend on grounds of futility is appropriate when a pleading is so deficient that "the court is convinced that its defects cannot be cured through re-pleading."  Tatone v. SunTrust Mortg., Inc., 857 F. Supp. 2d 821, 832 (D. Minn. 2012).[4] Here, Chief Judge Kishel found that repleading could not cure the defects with the Trustee's pleading on standing, (stating "It is not possible to conceive of any alternate set of facts to set up standing for the Trustee, absent irreconcilable conflict with the historical facts already pleaded"), and fraudulent transfer, (finding that "[t]here is no way that the Trustee could replead an alternate set of facts to counter this effect of Finn without indefensibly contradicting the factual premises for his present theory of recovery.").[5]  In re Polaroid, 543 B.R. at 903, 914.  While the Trustee contends that the Bankruptcy Court's conclusions on futility are based on speculation since no amendments were actually before the court, (Pl.'s Mem. at 17), the Bankruptcy Court found that no factual amendments could cure the legal deficiencies in the SAC, stating:

_____

[4]  As noted, this Court reviews the Bankruptcy Court's determinations of futility on a de novo basis.  Marmo, 457 F.3d at 755.

[5]  Although the Trustee does not appeal the dismissal with prejudice of his claims for breach of contract and fraud and misrepresentation, the Bankruptcy Court likewise found that "[t]he Trustee had three opportunities to flesh out a defensible structure for asserting these claims," but the factual pleading failed to state viable claims.  In re Polaroid, 543 B.R. at 905.

> [I]t does not appear that the Trustee can remedy the deficiencies by
> alternate fact-pleading. The Trustee had the onus to plead a plausible case
> in the first instance, and indisputable aspects of his pleading deprive him of
> that. These fundamental points of historical occurrence and sequence are
> conclusive, and they cut against any right to relief in favor of the
> bankruptcy estates. The Trustee cannot deny them now, for a repleading.
> Thus, granting leave to essay an amendment would be futile; these
> fundaments present an insuperable bar to relief under the only law that the
> Trustee cites as authority for avoidance.

In re Polaroid, 543 B.R. at 896.  This Court agrees.

Although no Third Amended Complaint appears to ever have been presented, the Trustee indicated its proposed amendments at the omnibus hearing before the Bankruptcy Court on December 1, 2015, (12/1/15 Bankr. Tr., Tab 2 to Opp. Fin. Appendix [Doc. No. 22 at 29-30]), and in its appellate brief before this Court.  (See Pl.'s Mem. at 27-28). While the Trustee's proposed amendments were not technically before the Bankruptcy Court, and therefore should not be considered on appeal, see Bath Junkie Branson, LLC v. Bath Junkie, Inc., 528 F.3d 556, 559-60 (8th Cir. 2008), this Court will nevertheless consider them, particularly since the Bankruptcy Court itself envisioned several factual allegations that might have supported the Trustee's claims, had they not been contradicted by the actual facts alleged.  See In re Polaroid, 543 B.R. at 902; 910.  For the reasons discussed below, however, the Court finds that even if those amendments had been permitted, they would not have cured the deficiencies in the pleading and would have contradicted the previously-asserted factual allegations.

## 1.    Standing

A bankruptcy trustee possesses the right to pursue state-law remedies for the fraudulent transfers of property of the bankrupt debtor that unsecured creditors of the

bankrupt debtor could have pursued.  <u>See</u> 11 U.S.C. § 544(b)(1).  The applicable state law

remedy here, the MUFTA, provides as follows:

> (a) A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

>   (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

>   (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

>    (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

>    (ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

> (b) In determining actual intent under paragraph (a), clause (1), consideration may be given, among other factors, to whether:

>   (1) the transfer or obligation was to an insider;

>   (2) the debtor retained possession or control of the property transferred after the transfer;

>   (3) the transfer or obligation was disclosed or concealed;

>   (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

>   (5) the transfer was of substantially all the debtor's assets;

>   (6) the debtor absconded;

>   (7) the debtor removed or concealed assets;

>   (8) the value of the consideration received by the debtor was reasonably

equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor.

(c) A creditor making a claim under paragraph (a) has the burden of proving the elements of the claim by a preponderance of the evidence.

Minn. Stat. § 513.44.

### a.    Debtor Entity Represented by the Trustee

In the Order, the Bankruptcy Court found that both the Trustee and the alleged creditors lacked standing.  As to the Trustee, Chief Judge Kishel raised the following rhetorical question:

> [H]ow does this plaintiff-trustee, as the steward of the bankruptcy estates of specific corporate entities, have standing to sue for the avoidance of the transfers that he identifies in his pleading–payments of money made by or out of a corporate entity (PettersCB or PettersCB Funding) that was not itself among the companies that were eventually put into bankruptcy to commence the cases in which this adversary proceeding was brought? The Trustee's fact-pleading featured almost nothing toward that issue.

In re Polaroid, 543 B.R. 897.  The Bankruptcy Court found that the Trustee–who, again, is the trustee for the Polaroid Corporation–failed to establish a right in bankruptcy to sue on behalf of PettersCB, by failing to allege facts establishing a legal successor-in-interest relationship between PettersCB and one of the Polaroid entities represented by the Trustee.  Id. at 899.  Chief Judge Kishel determined, based on the pleadings, that the only

possible transferors were PettersCB or PettersCB Funding, but Polaroid was not in Tom

Petters' enterprise structure at the time the transfers were made, nor was PHC or PCE.  Id.

Moreover, neither PettersCB nor PettersCB Funding is among the debtors in the cases for

which the Trustee has been appointed a steward.  Id.

The Trustee contends that had he been allowed to amend his pleading, he would

have submitted the following amendments, pleading a variant of successor liability "(and

more)":

> 1.  PettersCB was formed on January 17, 2003, under the laws of the State
> of Delaware.  Tom Petters was the sole ultimate owner of Petters CB
> throughout its existence.
>
> 2.  Effective 10:30 a.m. on April 27, 2005, PettersCB merged with and into
> Polaroid Holding Company under the name of Polaroid Holding Company
> ("PHC").  Like PettersCB, PHC was a creature of Delaware law.  Tom
> Petters was the sole ultimate owner of PHC from that point forward.
>
> 3.  Effective 10:31 a.m. on April 27, 2005, Petters Consumer Brands, LLC
> ("New PettersCB") was formed under the Delaware Limited Liability
> Company Act.  Tom Petters was the sole ultimate owner of NewPettersCB
> throughout its existence.
>
> 4.  Also on April 27, 2005, PHC transferred to NewPettersCB, by execution
> and delivery of a Bill of Sale, all of the rights and assets of PettersCB as at
> that time, after giving effect to the Merger, were held by PHC.  In addition,
> NewPettersCB assumed all of the liabilities that were formerly the
> responsibility of PettersCB.
>
> 5.  In exchange, NewPettersCB gave PHC the ownership of NewPettersCB.
> PHC immediately transferred it to Polaroid Corporation, of which Tom
> Petters was the sole ultimate owner.
>
> 6.  NewPettersCB continued the business of PettersCB with the same
> officers, directors, and employees, using the same office space, bank
> accounts, and name.  Many of PettersCB's creditors continued to do
> business with NewPettersCB and are among the ranks of the creditors who

have filed claims against NewPettersCB under its more recent name of
PCE.

(Pl.'s Mem. at 16.)

Without conducting any choice of law analysis, the Trustee asserts that Delaware
law of successor liability applies because both PettersCB and PCE were Delaware
entities.  (Id. at 32)  The Trustee relies on four theories of successor liability available
under Delaware law:  express assumption, de facto merger, mere continuation, and fraud.
(Id.)  While Delaware and the forum state of Minnesota follow the traditional corporate
law rule that a purchaser-successor does not ordinarily assume the seller-predecessor's
liabilities simply by purchasing the predecessor's assets, see, e.g., AJZN, Inc. v. Yu, No.
No. 13–149 GMS, 2015 WL 331937, at *15 (D. Del. Jan. 26, 2015); Knott v. AMFEC,
Inc., No. 09-CV-1098 (PJS/AJB), 2010 WL 1528393, at *2 (D. Minn. April 15, 2010)
(citing J.F. Anderson Lumber Co. v. Myers, 206 N.W.2d 365, 368 (Minn. 1973)),
Minnesota generally provides only two successor liability exceptions to for-profit
corporations:  contractual assumption of liability and liability where permitted by statute.
See Minn. Stat. § 302A.661, subd. 4.  But under one or more of the four successor
liability theories available in Delaware, the Trustee argues that he has standing, as the
representative of a successor entity, to avoid the fraudulent transfers of a predecessor
entity.  (Pl.'s Mem. at 28-36) (citing In re Think3, Inc., 529 B.R. 147, 198-200 (Bankr.
W.D. Tex. 2015); ASARCO LLC v. Americas Mining Corp., 396 B.R. 278 (S.D. Tex.
2008); In re Chipwich, Inc., Nos. 92 B 44298, 92-9943A, 1993 WL 118000 (Bankr.
S.D.N.Y. Mar. 31, 1993)).

This Court is not certain that Delaware law would apply under Minnesota's choice-of-law analysis. Nor is the Court certain that the facts of this case would support the Trustee's variation on successor liability, assuming that it would even be recognized in the Eighth Circuit. Despite its own reservations, however, the Bankruptcy Court assumed that a merger occurred, resulting in either PHC or PCE, in order "to get to the crucial issue at bar." In re Polaroid, 543 B.R. at 901. Because the Bankruptcy Court made this assumption and still found that further amendment would be futile, this Court will likewise assume, without finding, that the Trustee has sufficiently established that he possesses standing, as a steward of PHC, PCE, or both.

### b.   Creditors

As Chief Judge Kishel observed, under the MUFTA, "a creditor suing for avoidance must itself have a legally-enforceable right to payment from the debtor." Id. (citing Minn. Stat. §§ 513.44(a) (defining transfers that are "fraudulent as to a creditor" whose "claim arose before or after the transfer was made"), 513.45 (defining transfers that are "fraudulent as to a creditor whose claim arose before the transfer was made"), 513.41(4) (defining "creditor" as "a person who has a claim"), 513.41 (defining "claim" as "a right to payment," framed by several non-limiting characteristics)). Id. Similarly, the court in ASARCO noted that a plaintiff seeking avoidance under the Bankruptcy Code's corollary provision must establish the existence of an actual creditor with a viable claim against the debtor:

> In other words, each Plaintiff must prove: (1) at the time of the challenged transfer, there was in existence one or more creditors holding unsecured claims against the debtor; (2) the transfer could have been set aside by such

> creditor under Delaware law; and (3) at least one of the unsecured creditors
> with the right to challenge the transaction, or its successor in interest,
> continued to have a claim against the plaintiff until the commencement of
> the case and is entitled to an allowed claim against the estate.

396 B.R. at 316 (citing Commercial Bankruptcy Litigation § 10:4; Collier on Bankruptcy

¶ 544.09 (15th ed. rev.)).[6]

Applying such requirements to the facts alleged in the SAC, Chief Judge Kishel

raised the following question:  how, in December 2008 [when PCE filed for bankruptcy],

a creditor of PHC or PCE could have reached back beyond April 2005 [when Tom Petters

acquired Polaroid] to sue a transferee of PettersCB?  In re Polaroid, 543 B.R. at 901.  In

answer to his question, Chief Judge Kishel stated:

> The absurdity of the notion is clear, if such a creditor held a claim that arose
> from direct contractual privity between it and [PHC] or PCE. A transfer
> made by PettersCB years earlier would not have deprived such a creditor of
> anything at all, to which it could have justifiably looked for satisfaction of
> its claim against its own debtor ([PHC] or PCE).

Id. at 901-02.

"Looking far afield of that direct scenario," Chief Judge Kishel then envisioned a

hypothetical, five-pronged scenario that would support the Trustee's premise that PHC or

PCE are the "objectively-traceable successors in interest to the named transferor,

---

[6]  The Trustee appears to view his own standing and the standing of creditors as an
either/or proposition, framing his argument in support of creditors' standing as follows:
"[i]n addition or alternatively, creditors of PHC had standing to sue under the MUFTA to
avoid fraudulent transfers at issue as of the filing date."  (Pl.'s Mem. at 36) (emphasis
added).  But, as noted above, a viable fraudulent transfer claim requires that a trustee
represent the creditors of the debtor in question and that the creditors themselves have an
unsecured claim against the debtor that arose at the applicable time.  In re Polaroid, 543
B.R. at 898-901 (citations omitted); ASARCO, 396 B.R. at 316.

PettersCB." Id. at 902.  He determined that this "very specific stacking of historical

events" would require pleading the following facts:

> 1. The creditor's claim accrued before Tom Petters's acquisition [of
> Polaroid], as a result of direct contractual privity between it and PettersCB
> or PettersCB Funding.
>
> 2. The claim would have accrued during the period of the challenged
> transfers, or at least before PettersCB and PettersCB Funding passed out of
> the picture by merger or dissolution.
>
> 3. The creditor's claim was not paid timely under its own terms.
>
> 4. The creditor's claim was not satisfied before PettersCB was merged into
> Polaroid Holding Company and PettersCB Funding was dissolved.
>
> 5. The liability on the debt was expressly preserved and passed to one of the
> Debtors as part of the complex of transactions through which Tom Petters
> changed his alignment with the Polaroid enterprise by acquiring that
> enterprise in full.

Id.  Chief Judge Kishel also found that Step 5 of his hypothetical chain of events would

require an express, objective undertaking by the parties, through a novation.  Id.

Ultimately, the Bankruptcy Court found this envisioned sequence of events implausible,

explaining, "[l]enders or trade suppliers generally make their decision to extend credit

based on the worthiness of the specific party they are dealing with; and after that is done,

and a debt created, it is more likely that they would take a proffered merger as an

opportunity to get clear on the account, even if they countenance doing business with the

new entity in the future." Id.

Plaintiff's proposed amendments, (Pl.'s Mem. 16-17), however, do not track Chief

Judge Kishel's roadmap.  To correct the Trustee's acknowledged pleading errors

regarding the identification of creditors, (SAC ¶¶ 87, 92. 98, 104), the Trustee proposes

amendments that would identify six predicate creditors of PCE and two predicate

creditors of PHC.  (Pl.'s Mem. at 17.)  But the proposed amendments do not address:

when such claims accrued; whether the claims accrued pursuant to a contractual

relationship between PettersCB or PettersCB Funding and the creditor; whether the claim

accrued during the period of the challenged transfers, or before PettersCB and PettersCB

Funding merged or dissolved; whether the claim was untimely paid; or whether the claim

remained unsatisfied following the alleged merger into PHC.[7]

And, for the reasons identified by the Bankruptcy Court, In re Polaroid, 543 B.R.

at 902, the Court likewise finds it is not plausibly alleged that any current claims held by

creditors against PCE or PHC are outstanding, pre-merger claims based on transactions

with PettersCB, which would have occurred prior to 2005.  The Court therefore finds that

the Trustee has failed to establish standing.  Repleading would be futile as any alternate

set of facts establishing standing would conflict with the facts already pleaded.

### 2.      Claims for Actual and Constructive Fraud

In addition to the inadequacy of pleading standing, Chief Judge Kishel also

concluded that in light of Finn, the Trustee's fraudulent conveyance claims failed under

Rule 12(b)(6).  He correctly observed that the facts of Finn are "on-point to the pleaded

transactional facts here."  Id. at 905.

---

[7]  As for the last element identified by the Bankruptcy Court–some type of
contractual agreement to expressly transfer any liabilities from PettersCB Funding to PCE
or PHC–only because successor liability is presumed for the sake of argument, the Court
will assume that this element is met.

The debtor in <u>Finn</u> operated a Ponzi scheme, selling fraudulent participation interests in non-existent loans, but he also sold real, legitimate participation interests in real loans to two groups of transferees, the Respondent Banks and Alliance Bank. <u>Finn</u>, 860 N.W.2d at 642-44. The Ponzi scheme operator commingled funds from legitimate interest sales with fictitious sales. <u>Id.</u> at 642. The allegations against Alliance Bank were based on a real sale that was not oversold. <u>Id.</u> Similarly, the participation interests of the Respondent Banks were neither false nor oversold. <u>Id.</u>

The <u>Finn</u> court first dispensed with the application of the Ponzi scheme presumption to establish actual fraud under the MUFTA. <u>Id.</u> at 646-48. Among the reasons for not applying the presumption as to actual fraud claims, the Minnesota Supreme Court held that the presumption would "allow[ ] a creditor to bypass the proof requirements of a fraudulent-transfer claim." <u>Id.</u> The court observed that fraudulent intent could not be presumed because "[t]he asset-by-asset and transfer-by-transfer nature of the inquiry under MUFTA requires a creditor to prove the elements of a fraudulent transfer with respect to each transfer, rather than relying on a presumption related to the form or structure of the entity making the transfer." <u>Id.</u> at 647 (citing Minn. Stat. § 513.41(6), (9)). Fraudulent intent to establish actual fraud must therefore be determined under the facts of each case. <u>Id.</u>

Examining the pleadings, the Minnesota Supreme Court concluded that the receiver in <u>Finn</u> sufficiently stated a claim for actual fraud against the Respondent Banks. <u>Id.</u> at 654. The court found that the complaint alleged: (1) several fictitious and oversold participation interests; (2) that the debtor made the payments to the banks with actual

29

intent to hinder, delay, or defraud the creditors; and (3) the Ponzi scheme operator pleaded guilty to defrauding banks in connection with the commercial loans that he had arranged.  Id.  Moreover, the complaint was found to sufficiently allege that the debtor was insolvent at the time payments were made to the Respondent Banks.  Id.  As to Alliance Bank, however, which had reached the summary judgment stage in the district court proceedings, the court found that the record required summary judgment in Alliance Bank's favor rather than against it.  Id. at 655.  The court's decision centers on reasonably equivalent value, which is an element of a claim for constructive fraudulent transfer and a defense to a claim of actual fraudulent transfer.  See Minn. Stat. § 513.44(a)(1)-(2).  While the participation agreement between the Ponzi scheme operator and Alliance Bank, (which required the Ponzi scheme operator to receive payments on the loan, then remit payments to Alliance Bank), was part of a larger Ponzi scheme, the court found that satisfaction of the antecedent debt constituted "value" under the MUFTA.  Finn, 860 N.W.2d at 656.  Moreover, the factual record developed at summary judgment demonstrated that the rate of return on the loan that Alliance Bank had purchased was commercially reasonable.  Id.

As to constructive fraud, the Finn receiver asserted liability for constructive fraud pursuant to Minn. Stat. § 513.44(a), which applies to claims that "arose before or after the transfer was made."  Constructive fraud under § 513.44(a)(2)–the provision asserted by the plaintiff in Finn and by the Trustee here, (see SAC ¶¶ 91-96)–turns on proof that the debtor made the transfer or incurred the obligation while evincing a measure of financial distress, i.e., "without receiving a reasonably equivalent value in exchange for the transfer

or obligation, and the debtor:  (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction."  Minn. Stat. § 513.44(a)(2)(i).[8]  In <u>Finn</u>, the Minnesota Supreme Court stated that the Ponzi scheme presumption was not suited to claims under § 513.44(a)(2), because "the inquiry under that provision is only indirectly related to the debtor's insolvency."  <u>Finn</u>, 860 N.W.2d at 648.  Problematic for the court was that application of the presumption would dispense with a critical temporal element:

> MUFTA requires courts to determine whether the debtor fit within either of the two financial-distress measures in Minn. Stat. § 513.44(a)(2), at the time the transfer was made.  <u>See</u> Minn. Stat. § 513.44(a)(2).  As a practical matter, even if we were to assume that every entity operating a Ponzi scheme becomes insolvent by the time it is subject to one or more fraudulent-transfer claims, such an assumption still would not prove that such an entity was insolvent at the time it transferred its assets.  The temporal element is important because, as a factual matter, it is not at all clear that every fraudulent investment arrangement that is later determined to be a Ponzi scheme necessarily will have been insolvent from its inception.  For example, it is not hard to imagine a debtor that begins as a legitimate business and eventually turns to fraud, which the Respondent Banks insist occurred here.  Similarly, a debtor could have assets or legitimate business operations aside from the Ponzi scheme, as Alliance Bank argues here, that it uses to stave off insolvency, at least for a while.  Such an entity could be financially stable for a time, whether its stability is measured by the technical definition of insolvency in Minn. Stat. §§ 513.42 and 513.45(a), or the alternate methods of measuring financial distress in Minn. Stat. § 513.44(a)(2).

<u>Id.</u> at 648-49.

---

[8]  The statute provides a second measure of financial distress in § 513.44(a)(2)(ii), where the transfer was made without the receipt of reasonably equivalent value and the debtor "intended to incur, or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."  The Trustee does not invoke this subsection of the MUFTA in the SAC.

###### a.      Actual Fraud

Chief Judge Kishel determined that the Trustee's fraudulent transfer claims failed

in light of Finn.  He observed that the SAC repeatedly emphasized the actual, real-

life nature of the PettersCB business.  In re Polaroid, 543 B.R. at 906 (citing SAC ¶¶ 24,

41, 48-49).  Moreover, he found that

> [t]he Trustee never alleges that any of the money PettersCB borrowed from
> [Opportunity Finance] was diverted away from real transactions in
> Polaroid-licensed merchandise, in fraud of [Opportunity Finance] or any
> other person or entity.  He never pleads that money originated by
> [Opportunity Finance] was funneled through PettersCB into the main churn
> of Tom Petters's Ponzi scheme–the activity that Tom Petters carried on
> through the core of PCI, broadly pretensed on non-existent "diverting"
> transactions in ostensibly-preexisting consumer merchandise inventory.
> Nor does he ever accuse Tom Petters of using a separate scheme-structure
> like PCI's in 2004–2005, that would have been centered around an
> exploitation of the Polaroid brand and maintained to defraud
> lender-investors under a specific pretense of dealing in Polaroid-branded
> merchandise.

Id. at 907.

The Bankruptcy Court noted that the only term of the loans cited by the Trustee as

indicative of a lack of reasonably equivalent value was the 12% interest rate borne by

PettersCB.  Id. (citing SAC ¶¶ 64, 67.)  While the Trustee characterized that rate as

excessive, Chief Judge Kishel stated that without any comparison to the prevailing market

rate for similar transactions, the Trustee's allegation only served to reinforce its

characterization of the aggregate interest as "false profits."  Id.  The Bankruptcy Court

found the Trustee's concept of false profits was improperly applied "to the return on

investment from the financing of genuine deals, on the sole pleaded ground that the rate

on the lending was somehow excessive, predatory."  Id.  And, in other portions of the

SAC, the Bankruptcy Court observed that the Trustee implicated PettersCB's involvement in actual deals as a part of a broad pretense to lure investors "into the fraudulent operations <u>elsewhere</u> in Tom Petters's enterprise structure." <u>Id.</u> at 907-08.

Under the Trustee's broad pleading, the Bankruptcy Court found that <u>no</u> lending to PettersCB could have provided a foundation for reasonably equivalent value because Opportunity Finance's original lending to PettersCB was worthless, since it only prolonged an inherently fraudulent enterprise. <u>Id.</u> at 909. The one allegation that Chief Judge Kishel found to be only slightly more specific was that the merchandising of Polaroid-branded goods through PettersCB functioned only as a front, to give Petters' business activities "a false air of legitimacy and to extend the duration of the Ponzi scheme." <u>Id.</u> at 910 (citing SAC ¶¶ 24; 42). But Chief Judge Kishel found, as in <u>Finn</u>, that even while a Ponzi scheme was underway in other parts of Petters' empire, the actual deals pleaded by the Trustee here gave PettersCB a legitimate source of earnings with which to pay Opportunity Finance, on debt that had been taken on to finance the real deals. <u>Id.</u> He observed that the SAC "stretched too far in the way it would classify its real-goods-real-proceeds events to meet the causality-based requirement of the federal presumption," i.e., that the transactions be made "in furtherance" of a Ponzi scheme. <u>Id.</u> at 909.

With the Ponzi scheme presumption removed as a means by which to establish actual fraud, the Trustee argues that the allegations in the SAC still sufficiently plead the elements of actual fraudulent transfer, by establishing the requisite elements of traditional

fraud.[9]  (See Pl.'s Mem. at 37.)  As to the element of actual fraudulent intent, the Trustee

points to his allegations that PettersCB made the transfers to Opportunity Finance in order

to induce other creditors to invest in PettersCB.  (Id. at 39) (citing SAC ¶ 57).   Further,

the Trustee asserts that the Bankruptcy Court apparently overlooked the allegation in the

SAC alleging actual knowledge: "During the relevant time period, [PettersCB] and/or

Tom Petters knew that [PettersCB] was destined to fail, and [PettersCB] ultimately and

inexorably did fail."  (Id.) (citing SAC ¶ 39).[10]

The Court agrees with the Bankruptcy Court's conclusion that the Trustee cannot

state a claim on which relief may be granted for actual fraudulent transfer.  Even

assuming the truth of the Trustee's allegation that a 12% interest rate was excessive,

(SAC ¶ 64), and that the Prepayment Penalty Transfer was unnecessary, (SAC ¶¶ 53-54),

the Trustee buttresses his pleading of fraudulent intent with allegations that still invoke

the Ponzi scheme presumption and otherwise contradict Finn.  He asserts that PettersCB

made the transfers in question, at excessive interest rates, "with actual intent to hinder,

---

[9]  The Trustee proposes no additional amendments with respect to his fraudulent
transfer claims, other than those discussed earlier regarding the chain of successor
liability and identification of creditors.

[10]  At the hearing on the instant appeal, the Trustee's counsel also referred to an
internal DZ Bank email that purportedly stated that the head of Opportunity Finance was
"in on the fraud."  Any such evidence, however, is not properly before the Court on a
motion to dismiss, where the court considers only the facts alleged in the complaint,
"materials attached to the complaint as exhibits," Morton, 793 F.2d at 187, and
"documents whose contents are alleged in [the] complaint and whose authenticity no
party questions, but which are not physically attached to the pleading." Kusner v. Beverly
Enters., Inc., 317 F.3d 820, 831 (8th Cir. 2003) (quotation and citation omitted).  This
verbal reference to an email does not fall within any exception and is not considered here.

delay or defraud a creditor, given than PCB was part of the Ponzi scheme and destined to fail with the Ponzi scheme, and that the Transfers furthered, and were intended to further, the Ponzi scheme." (SAC ¶ 55.) Similarly, the Trustee asserts that PettersCB knew that it was insolvent and destined to fail, (SAC ¶ 56), and that PettersCB made the transfers with actual intent to defraud by postponing the "discovery of the facts that PCB was insolvent, propped up with Ponzi funds and assumption of debt by related parties, and unable to pay its creditors legitimately," thus misleading PettersCB's creditors. (SAC ¶57.) Similarly, he alleges that "PettersCB and/or Tom Petters knew that PettersCB was destined to fail." (SAC ¶ 39).

Yet Finn instructs that commingled funds, let alone the presence of a flourishing Ponzi scheme elsewhere in a related organization, are insufficient to establish actual fraud. Finn, 860 N.W.2d at 642; 652. The factual allegations in the SAC repeatedly assert that PettersCB operated as a legitimate, stand-alone entity, with a separate bank account, to which real retailers made real payments for real goods on real purchase orders, (SAC ¶¶ 24, 36, 46), "divorced structurally and operationally from the central churn of money within the Petters scheme." In re Polaroid, 543 B.R. at 910. In Finn, while the court determined that the element of actual fraudulent intent was sufficiently pleaded against the Respondent Banks, the complaint there documented several fictitious and oversold payments to the Ponzi operator and also alleged that the operator admitted to operating a Ponzi scheme to defraud banks. Finn, 860 N.W.2d at 654. No such facts, specific to PettersCB, support actual fraudulent intent here. Rather, as the Bankruptcy Court found, "all of the Trustee's pleaded facts go to the way in which PCI was operated,

to the detriment of <u>its own</u> lenders and investors.  Not a single pleaded fact goes to show

how <u>PettersCB</u> would have paid [Opportunity Finance] with a contemporaneous intent to

hinder, delay, or defraud <u>its own</u> creditors."  <u>In re Polaroid</u>, 543 B.R. at 912.  Specifically,

as Chief Judge Kishel observed, the Trustee does not allege facts that PettersCB

channeled the funds to PCI or that PettersCB operated a business akin to PCI itself.  <u>Id.</u> at

912.  Instead, PettersCB traded in real goods.

Relying on <u>European Roasterie, Inc. v. Dale</u>, No. 19-cv-53 (DWF/JJG), 2010 WL

1782239, at *3 (D. Minn. May 4, 2010), the Trustee argues that the SAC sufficiently

alleges intentional fraud by pleading that PettersCB induced future creditors to invest,

while knowing that they would never be paid.  (Pl.'s Mem. at 39.)  The Court disagrees

that the SAC sufficiently pleads the element of actual intent.  First, <u>Finn</u> is now the

controlling authority by which to assess the adequacy of fraudulent transfer pleading

under the MUFTA.  Not only does <u>Finn</u> control as a matter of law, the facts of <u>Finn</u> are

analogous to the facts here.  In contrast, <u>European Roasterie</u> pre-dates <u>Finn</u> and does not

arise under the MUFTA.  Instead, it involves claims of fraud and breach of contract, with

the Defendant arguing unsuccessfully on a motion to dismiss that mere broken promises

cannot amount to fraud.  <u>European Roasterie</u>, 2010 1782239 at * 3-4.  The cases cited by

Plaintiff in his reply brief in support of his pleading of fraudulent intent, <u>In re Sentinel</u>

<u>Mgt. Group, Inc.</u>, 728 F.3d 660, 667 (7th Cir. 2015) and <u>In re Am. Properties, Inc.</u>, 14

B.R. 637, 643 (Bankr. D. Kan. 1981), are similarly non-controlling and distinguishable.

They do not involve an independent entity operating legitimate transactions while a Ponzi

scheme operated in other parts of an enterprise structure.  The Court agrees with the

Bankruptcy Court that the allegations of actual intent in the SAC are entirely tied to the general Ponzi scheme, with no non-conclusory allegations adequately supporting PettersCB's actual intent.

The Court therefore finds that absent the Ponzi scheme presumption, which <u>Finn</u> makes inapplicable to the MUFTA, the Trustee does not plead any set of facts to support the element of actual fraudulent intent.  Lacking this critical element, the Trustee's claims of actual fraudulent transfer fail.  The Court likewise agrees with the Bankruptcy Court that given the Trustee's factual allegations concerning the real-life nature of the transactions of PettersCB, any amendments would necessarily contradict the already-pleaded facts.  Accordingly, the Court agrees with the Bankruptcy Court that this claim should be dismissed on grounds of futility.

### b.      Constructive Fraud

Under the MUFTA, constructive fraud may be alleged where the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value for the transferred property, and the debtor:

> (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>
> (ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Minn. Stat. § 513.44(a)(2).

As noted, the Bankruptcy Court held that the Trustee's claim for constructive fraud under the MUFTA also failed.  <u>In re Polaroid</u>, 543 B.R. at 911-14.  Chief Judge Kishel

found directly applicable to the Trustee's constructive fraudulent transfer claims the

following holding in <u>Finn</u>:

> At this point, it can be said that Finn settled one thing for the application of MUFTA's constructive-fraud remedies to transactional history that features the presence of a Ponzi scheme perpetrated by the transferor. On the specific facts before it, the Finn court held that the debtor-transferor does receive reasonably equivalent value for the repayment in full of debt owing per contractual terms to an investor that had funded a real-life, bona fide, closed, and consummated business transaction—despite the fact that the debtor-transferor was perpetrating an operating Ponzi scheme to defraud other investors through the same type of transaction.

<u>Id.</u> at 913 (citing <u>Finn</u>, 860 N.W.2d at 655).  Finding that "the factual, historical presence

of a real-life deal for the original investment defeats a clawback plaintiff's prima facie

case on constructive fraud," Chief Judge Kishel observed that here, the Trustee "does not

identify anything <u>but</u> real-life transactions." <u>Id.</u> at 914.  The Bankruptcy Court concluded

that the SAC failed to establish that the transfers were for less than reasonably equivalent

value.  <u>Id.</u> at 913-14.  In reaching his conclusion, he observed that on the facts of <u>Finn</u>, "a

debtor-transferor does receive reasonably equivalent value for the repayment in full of

debt owing per contractual terms to an investor that had funded a real-life, bona fide,

closed, and consummated business transaction–despite the fact that the debtor-transferor

was perpetrating an operating Ponzi scheme to defraud other investors through the same

type of transaction." <u>Id.</u> (citing <u>Finn</u>, 860 N.W.2d at 655).  Therefore, the "presence of a

real-life deal for the original investment defeats a clawback plaintiff's prima facie case on

constructive fraud." <u>Id.</u>

　　　　While it is true that repayment of an antecedent debt can constitute reasonably

equivalent value, <u>Finn</u>, 860 N.W.3d at 650, the Trustee argues on appeal that he does not

rely on the Ponzi scheme presumption to allege his constructively fraudulent transfer claim.  Rather, he argues that his allegations concerning the 12% interest rate–applicable to all of the transfers at issue with the exception of the Prepayment Penalty Transfer–sufficiently asserts a lack of reasonably equivalent value, as this rate was allegedly in excess of the market rate at the time.  (Pl.'s Mem. at 46) (collecting cases in which allegations asserting that the transferee received payment above the market rate were sufficient to allege the element of lack of reasonably equivalent value).  And with respect to the Prepayment Penalty Transfer, which the Trustee argues the Bankruptcy Court overlooked, he contends that it also satisfies the requirement of pleading a lack of reasonably equivalent value.  (Id. at 47.)

Regarding the 12% interest rate, the Court rejects authority cited by Defendants for the proposition that a 12% interest rate is per se reasonable.  (See DZ's Opp'n Mem at 31 [Doc. No. 19]) (citing In re Unified Commercial Capital, Inc., 260 B.R. 343, 353 (Bankr. W.D.N.Y. 2001); In re Carrozzella & Richardson, 286 B.R. 480, 491 (D. Conn. 2002)).  Rather, a 12% rate was found reasonable based on the particular facts of those cases.  But even if this Court assumes that Plaintiff's allegations concerning the interest rate and the Prepayment Penalty Transfer sufficiently establish a lack of reasonably equivalent value for constructive fraudulent transfer, the Trustee's claims still fail.

While the Trustee contends that the Bankruptcy Court did not find fault with his allegations concerning insolvency, (Pl.'s Mem. at 44), the Bankruptcy Court simply did not address his insolvency pleading, having found the Trustee's constructive fraud pleading deficient on the lack of reasonably equivalent value.  The Trustee's allegations

concerning the insolvency of PettersCB at the time of the transfers rely on the existence

of the Ponzi scheme.  (See SAC ¶¶ 70-79. )  For example, the SAC alleges:

> Given [PettersCB's] significant debt, its operation at a net loss, its
> participation in the Ponzi scheme orchestrated by Petters, and the fact that
> [PettersCB] was propped up with Ponzi money, [PettersCB] at all times was
> engaged in, and/or was about to engage in, a business for which its
> remaining assets were unreasonably small in relation to its business;
> alternatively, PCB intended to incur, or reasonably should have believed
> that PCB would incur debts beyond its ability to pay as they became due.

(SAC ¶ 78.)

Such allegations are conclusory and merely track the statutory language.  See

Minn. Stat. § 513.44 (a)(2)(i)-(ii).  When the Finn court examined the adequacy of the

receiver's insolvency pleading in the constructive fraud claims against the Respondent

Banks, the court found allegations tracking the statutory language were sufficient when

combined with other factual allegations.  Finn, 860 N.W.2d at 654.  Namely, the receiver

alleged that the Ponzi scheme operator diverted $23 million to support his lifestyle and

maintained no financial oversight to track the transfers.  Id.  Here, however, the SAC

lacks such allegations to support the element of insolvency.  To the contrary, the

allegations in the SAC generally suggest that PettersCB was a legitimate business

concern.  (See, e.g., SAC ¶ 24) (stating, "[U]nlike many of Tom Petters' companies,

[PettersCB] actually purchased, warehoused, and sold to prominent retailers high volumes

of consumer electronic equipment, branded with the 'Polaroid' name.")  As the

Minnesota Supreme Court observed in Finn, a debtor engaging in both legitimate and

fraudulent interests could use its legitimate business assets to hold off insolvency and

remain financially stable for a time.  860 N.W.2d at 649.  The Court therefore finds the

element of insolvency lacking.  Given that factual allegations concerning the legitimate

business conducted by PettersCB, the Court concludes that any amendments would be

futile, as they would contradict the facts already alleged.  For all of these reasons, the

Court finds that the Trustee's pleading fails to state a claim for constructively fraudulent

transfer.

### 3.    Claims Against DZ Bank

Having found that Plaintiff's claims against Opportunity Finance fail as a matter of

law and amendment would be futile, the Court likewise finds that the Trustee's claims

against DZ Bank fail.

## III.    CONCLUSION

The Court recognizes that the <u>Finn</u> decision, issued by the Minnesota Supreme

Court during the pendency of the underlying adversary proceedings and after the filing of

the SAC, had a significant impact on the legal theories in this action.  While a plaintiff

may still assert viable claims of actual and constructive fraud under the MUFTA, the

Ponzi scheme presumption is not an available means by which to do so.  The legitimate

business that PettersCB undertook is quite distinguishable from the fictitious interests that

Tom Petters peddled through PCI–a distinction that Chief Judge Kishel noted: "[t]he

transactions pleaded here were very different in nature from those that Tom Petters

pretensed for his scheme; the Trustee admits that Tom Petters really did act through

PettersCB to procure the manufacture of goods from Polaroid branding, and then sold

them to real customers."  <u>In re Polaroid</u>, 543 B.R. at 910.  In contrast, "the engine of the

PCI-centered scheme was very different:  using one or several entities to ostensibly serve

as a factor between a holder of preexisting goods and an end-customer, with the Petters

entity ostensibly acquiring the goods using borrowed monies and then "diverting" them to

its pretensed customer." Id.  But as the Bankruptcy Court observed, see id. at 891-92, by

attempting to allege facts similar to the PCI clawback litigation, the allegations here

concerning how PettersCB fit into the Tom Petters' enterprise structure are conclusory

and internally inconsistent with the allegations concerning the legitimate business deals

conducted by PettersCB.  Additionally, the SAC is deficient in asserting separate,

plausible bases for the fraudulent transfer claims.  Therefore, for all of the reasons set

forth above, the Court agrees with the Bankruptcy Court that further amendment of the

pleadings would be futile.


**THEREFORE, IT IS HEREBY ORDERED that:**

1.      Appellant's Appeal from Bankruptcy Court [Doc. No. 1] is **DENIED**; and

2.      The January 14, 2016 order of the Bankruptcy Court and the December 1,

2015 oral order of the Bankruptcy Court are **AFFIRMED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: December 23, 2016

                              s/Susan Richard Nelson
                              SUSAN RICHARD NELSON
                              United States District Judge